The next case is Roice v. County of Fulton. May I proceed, ma'am? Good morning. May it please the Court. My name is Elmer Robert Keech III, and it is my privilege to appear here this morning on behalf of Appellant Adam Roice. I'll begin my presentation by discussing what I believe is an endemic problem in some federal courts in this judicial circuit, where the ultimate arbiter of who's telling the truth and who's not, the arbiter of credibility, the arbiter of contested facts, is not a sworn jury of six or eight people who are going to decide who is right and who is wrong, but is rather a district court judge who, acting outside the scope of his review, makes those decisions on his own. In the decision that Judge Shup put forward, he talks about that the plaintiff's entire case is a house of cards, it's a quantum inferential leap, that the plaintiff waived his claims to assert medical malpractice or negligence claims against the defendant in the course of their 25-page memorandum of law and submission of over 2,000 pages of exhibits. That simply is just untrue, and that is an unfair statement that Mr. Roice waived his or consented to the dismissal of his State law negligence and medical malpractice claims. There was an extensive discussion in those briefs about deliberate indifference to serious medical needs. Deliberate indifference to serious medical needs is a much higher standard than a State law negligence claim. The entirety of the briefing put forward by all parties focused on the credibility of Mr. Roice and the credibility of other proof that was put before the Court, but primarily Mr. Roice's credibility. There's a claim that, you know, his complaints about severe stomach pain, about vomiting, which would be indicative of having severe gallstones, were never conveyed to medical personnel at the Fulton County Jail based on the medical records at the Fulton County Jail. You say at one point in your briefing that the contested fact at the heart of this case is whether the plaintiff complained about nausea and abdominal pain prior to May 29th, this important date. And I know, I found in the record he definitely complained of nausea on May 12th, and there's evidence of that. But could you marshal for us, other than that, what is the evidence that he informed prison officials of such pain before May 29th? Yes, Judge Livingston. There is obviously a complaint that's reflected in the logbook that was prepared by a corrections officer that Mr. Roice was complaining of negligence. There are three statements from inmates who indicated that Mr. Roice was repeatedly complaining of negligence. Mr. Plummer and Mr. Barton made those complaints, albeit that they were discharged from custody prior to Mr. Roice being sent to the hospital. But importantly, Freddie Barksdale, who was incarcerated, or was housed with Mr. Roice throughout the entirety of his detention, indicated that he was complaining consistently for weeks about these issues before he had to go to the hospital, and that his condition became much, much worse in the four to six days before he left for the hospital, and that it was evident to him, as a layperson, that Mr. Roice needed medical care. Now, so that's the first component of where the proof that the plaintiff put forward. Obviously, the second component is the plaintiff's extensive testimony stating as much. The plaintiff said in his deposition, I was complaining constantly about these issues. Furthermore, in support of a negligence claim, this would be more beyond, obviously, what Mr. Roice had said or what's reflected in the record, but to address the heart of Judge Sharpe's decision that there's a waiver here or that there's the plaintiff consented to these issues, the plaintiff put forward an expert disclosure that the defendants themselves referenced, or excuse me, an expert disclosure, and that expert was deposed. The defendants themselves referenced Dr. Eisner's testimony in their submission to the Court, and that expert report said if it's true, if Mr. Roice is to be believed that he made these complaints, this is a breach of the standard of care. This is deliberate indifference to serious medical needs. Dr. Eisner was cross-examined extensively by the defense attorney for Montgomery County on those issues, and he said the same thing over and over again. If he made these complaints, if this is true, this is a breach of the standard of care. The final point I'd like to raise, and this is a more subtle point to your question, Judge Livingston, there is definitely an altered medical record here. And these medical records aren't part of a professional medical record-keeping system that you'd find in a hospital, you know, where there's going to be time stamps if there are edits, those are going to show up. This is a couple of nurses using fillable Adobe PDF forms. The medical record from May 29, 2014, filled out by Nurse Addy at 1040 in the morning says Mr. Roice was observed doing push-ups the day before. And there's no ñ and now, the defendants didn't preserve any of the other video in this case besides Mr. Roice doing push-ups, despite our request, despite the filing of a timely notice of claim under State law. But they did produce that. Oh, here he is doing push-ups. Now, if someone has gallstones, it's not unusual for their symptoms to wax and wane. But more importantly, Lieutenant Crenshaw, who's the jail administrator, testified that he's the only one that looked at that video, and he didn't look at that video until after Mr. Roice went to the hospital. So the whole defense of this case is we've got our medical records. Our medical records say Roice wasn't complaining. Well, I've got one medical record that I could show all day long was fabricated after the fact. I didn't quite ñ I didn't understand that when I read it in the brief, and I guess I'm still not quite understanding. What is the basis for saying that there was a fabrication with regard to that video? Your Honor, if you look in the record on appeal at page 12 ñ at 1244, that is a ñ Could you say that number again? 1244. Thank you. That is a medical record that was prepared by Tina Addy, who is a defendant in this case. And in that record, she said at 1040 in the morning ñ now, this is several hours before Mr. Roice goes to the hospital ñ I looked at the tapes from yesterday, and I saw Mr. Roice doing push-ups. Now, Lieutenant Crenshaw testified that he's the only one that had the authority to look at those tapes, and he's the only one that did look at them. And he testified that he looked at those tapes after Mr. Roice went to the hospital a day later. And you'll find that testimony at pages 1812 and 1813 of the record on appeal. But I thought you were claiming that they fabricated their medical records. That is a medical record that was fabricated. The evidence of him doing push-ups? The evidence of him doing push-ups is not fabricated. The timing on the record is fabricated. That record was clearly created after Mr. Roice was in the hospital. So there's ñ Perhaps I misunderstood. I thought you were suggesting that it was the records of his ñ the degree of his complaints that were fabricated. That's not what you're claiming. It's this when they saw him do the push-ups. It is when they saw him do the push-ups. All right. Now, just to finish this point, you're not disputing that there is a record of him doing push-ups. Judge Radji, I am not disputing it. And that it's got a date on it? That footage was taken on May 28, 2014. The record in question that I referred the court to was taken on May 29, 2014. I'm asking you if it's disputed when the video is ñ the date of the video. No. It's not disputed. And the date of the video is when? The day before he went to the hospital. Okay. So in that sense, what is the materiality of whether the declarant saw it before or after he went to the hospital? There is no dispute that the day before he was ñ went to the hospital, he was doing push-ups, if I understood you correctly just now. You do, Judge Radji. Okay. So what's the materiality of the purported falsification of the viewing statement? The materiality is that it's reflected that that record was created on May 29th. But what does that matter? Well, if it's ñ I may be missing something. What does it matter if there's no dispute about the actual date of the push-ups? Because it was a record that was created to reflect that it was made before Mr. Royce went to the hospital. And, in fact, it was made well after. And as far as we're concerned, it may have been made after ñ Sotomayor, let me just make myself clear. In any event, if I could just take you back for a minute to the degree to which you have evidence of serious complaints beforehand. I just went back and looked, and I gather that two of the inmates, Mr. Plummer and Mr. Burton ñ I'm sorry, Mr. Plummer and ñ yeah. That's right, Judge. They were released sufficiently long beforehand that they could not have seen what they were reporting to have seen. Or did I miss something? One of the gentlemen, and I'm not sure if it was Plummer or Burton, was released, I believe ñ Plummer was released from jail 23 days before the plaintiff's hospitalization. His testimony was that he saw vomiting 7 to 10 days before your client was taken to the hospital. I understood that to not be possible now in light of his release date. Is that right? I would agree he was not in the jail at the time. The way that that ñ Mr. Burton was released 36 days before your client was hospitalized. He said that your client was complaining of nausea many times in the 7 to 10 days before he was hospitalized. Am I right about that? I believe that his testimony says that, if I may. So that's ñ that's not possible. It is not possible, but it was the way that that deposition was conducted that led to that testimony being proper. I mean, you know, there was an opportunity to correct. The point is, it looks to me like those depositions do not provide evidence of complaints of serious pain in the days right before the hospitalization. So what are we left with that does have to be viewed in the light most favorable to your client, but that's not refuted by other evidence? What do we have? It would be the affidavit of Freddie Borksteel. And Mr. Borksteel's ñ He's testified that your client would occasionally vomit about 3 to 4 weeks before being detained, and he saw the plaintiff complain about medical problems daily. But I don't think there he says with what degree of severity. I ñ in that point, Judge Raggi, I respectfully disagree. He did detail in his affidavit that in the 4 to 6 days before Mr. Royce went to the hospital, his condition became much worse, and that it was ñ I believe the quote from the affidavit, it was evident to him as a layperson that Mr. Royce needed medical care. Right. Now, the basic thrust of your complaint is that the degree of care he was getting in the prison was not adequate to his condition, right? That it was too conservative. It should have been ñ it should have addressed the condition more aggressively. Right? Yes, Judge Raggi. That's correct. Okay. Now, am I right that once he is hospitalized for the first few days in the hospital, they are also treating conservatively? That is correct, Your Honor. The ñ but the problem is, is preventing pancreatitis in the first place. Once you have pancreatitis, it's too late. You can't really do much with it. But it's the gallstones that go down into the ñ through the bile duct that block the duct to the pancreas that then can cause the pancreatitis. I am just trying to deal with the fact that disagreements about treatment do not State a constitutional claim unless they rise to the level of deliberate indifference or worse. And I'm trying to understand what evidence would allow a jury to find more than disagreements about the treatment. I mean, I do understand this has to be most favorably to your client, but ñ That would be Mr. Royce's testimony that he was complaining vociferously about vomiting, about severe abdominal pain, and that would be Mr. Barksdale's very detailed, similar testimony that Mr. Royce was complaining about these issues and he ñ and was ignored. I agree with you, Judge Raggi, that the case authority is, if there's a disagreement of overtreatment, that doesn't rise to the level of deliberate indifference to serious medical needs. It certainly rises to the level of negligence, which is an issue that the Court quite frankly ignored and glossed over. But if you ñ if you are presented with a condition and someone reports to ñ someone says, I'm having chest pain, and that ñ you know, and that chest pain is maybe related to angina. And so the doctor just ignores that and says, ah, you've got ñ you've got ñ you've got indigestion. Go back to your cell. And you see that all the time in prisons in these medical cases. And then that person's angina progresses or whatever cardiac condition he has progresses, and he has a heart attack. And an expert looks at that and says, hey, if someone would have treated this cardiac condition earlier, that would have prevented the heart attack. That can substantiate a case for deliberate indifference to serious medical needs. And the hypothetical I just described, Your Honor, is the same thing as ñ as what happened with Mr. Royce, except it involved a different organ. He's got these gallstones. Gallstones are a serious medical need that need to be taken care of. His ñ his pancreas, which is ñ or excuse me, his gallbladder, which is filled with these things. He's got them passing down through the bile duct. It's causing him severe pain. It's causing him to be nauseous. He's complaining about it repeatedly. Veciferously, according to ñ Isn't that a problem, though, for your ñ for your case, that he didn't indicate when he was admitted to the facility that he had current ñ that he had this problem with his gallstones, that he had past procedures or that this was an issue for him? And this is the type of illness that often resolves itself. So you're in a situation where careful attention can be an ñ even outside of deliberate indifference. Even if we are thinking of it just as medical malpractice, can be an inappropriate treatment, careful watching to see how the ñ what progresses. I mean, and I understand there are factual disputes about whether there were more severe complaints, and I've looked at the record at that. But it would have helped your case dramatically if the facility had been aware of his gallstone history. There's two corollaries to that, Judge Livingston. First off, that Mr. Royce is mentally disabled. He's ñ he has a very limited mental capacity. So that impacts on things. And second, the ñ the jail has every opportunity to get his medical records from his treatment providers, and they did not do that. Where this transforms in, you know, from the realm of what you have described, which is, hey, we should have a watch and we should have a wait-and-see, to where it ñ you know, to where it is ñ if this guy needs to go to the hospital, it's in this, like, three- to four-day time period before he ends up in the hospital where things are becoming severe. You can talk ñ he's talking about, you know, vomiting up blood. I mean, is this ñ that's ñ it doesn't get any worse than that. And, you know, by ñ and by the ñ this is a typical situation where you have a preventable medical condition. If you send this guy out to a gastroenterologist, you know, this is easy to treat. You send him out to a gastroenterologist. They do an ultrasound of the gallbladder. They see the stones. They go in. They use ñ they use sound waves. They blow the stones up, or they go in and they operate and they take the stones out, or they remove the gallbladder. Then you don't have these severe consequences after the fact, like Mr. Royce has, which are life-altering consequences. I mean, this man is never going to be the same. You know, his pancreas ñ you know, part of his pancreas was destroyed. So where you have that transition is in that couple days beforehand where he's complaining. I mean, there's proof in the record that he's complaining. And nothing's done. And no effort is made to help the man. MS. GOTTLIEB You wanted to reserve a minute of rebuttal time? MR. BOUTROUS I'm obviously well past my time, Your Honor. MS. GOTTLIEB Yes. MR. BOUTROUS I just ñ if I could just add one point. We've ñ obviously, the plaintiff has also asserted Menel claims. Those claims are briefed up in the ñ you know, it's a great length in the appellant's brief. But part of the reason why this happened, from my perspective as Mr. Royce's counsel, is that you have inadequate funding for medical care at that facility. You have nurses making medical diagnoses, which is exactly what Nurse Addy did, which is way outside the scope of her practice ñ when to call a physician, when not to. Nurses observe and report. They observe and report to a physician and get direction about what to do. They don't make those decisions themselves. Nurse Addy did that repeatedly. And, in fact, there's evidence in the record that corrections officers are doing that as well. And that was going on at the county jail for 15 years. And the Commission of Corrections told the sheriff to stop doing it. Thank you for your consideration of my arguments, Your Honors. MR. ROYCE. Thank you, Mr. Chairman. May it please the Court, good afternoon. Stephen DeBracio from Berks, Colomero, and Heard on behalf of appellees, the County of Okay. I'd like to focus on three points in argument today, the deliberate indifference, the Monel and the supervisory liability portion, but I'll address Mr. Keech's state law issues as well. For deliberate indifference, as was noted in our brief, the evidence of an altered record, as Your Honor pointed out, is not relevant to the symptoms of Mr. Royce, and frankly is likely explained by misdating a form. As I noted in our brief, the plaintiff himself misdated the form at one point by several years, and I grant you he does have a learning disability, but it's clear he knows how to fill out sick call slips, and at one point when he had an angry exchange with the nurse, he complained of bail and adult problems. So I would contest an assertion that he's not capable of addressing his own symptoms. I'll start with moving to Monel. Plaintiff's evidence, for example, the — with respect to the correctional officers making diagnoses, Defendant Lori addressed any shortcomings with the Commission on Correction in 2007, and has — while he has expressed some minimal concerns about staying within the budget generally, he has been adamant that there is no policy to deny medical services to inmates at the Fulton County Correctional Facility. I want to quote from Captain Curtis on page 1947, you do the right thing. If they, the medical staff, deem it necessary that the inmate has to go out as in the provider, then the inmate goes out. That was the standard of care that was followed in this case. Your Honor has pointed out in cases today, why is summary judgment proper? We have a lot of evidence for trial, but why is summary judgment proper? It's proper for two reasons. One, the high standard that has to be met for a deliberate indifference claim. Plaintiff's evidence supplants to one shift log entry on May 12th, which showed that he complained of nausea. What about Freddie Barksdale's affidavit? I'm sorry? What about the Freddie Barksdale? Yes. His statement about plaintiff's symptoms are inconsistent with plaintiff's own description of plaintiff's symptoms. We look to the St. Mary's Hospital records, which even plaintiff's expert admitted are above reproach and they have no reason to alter any records. And Mr. Royce indicated there he complained of nausea the day before, on the 28th. So Mr. Barksdale's statements. Are you clear that that's an assertion, that that's the only day he complained about it? My understanding is the St. Mary's experts show, the St. Mary's Hospital records show that was the, that was when he said, when did you start having nausea? When did you start having nausea? That's inquiry? That's my understanding, yes. In any event, turning to supervisory liability for Defendant Laurie, there are, of course, five Cologne Pataki factors. I'll just focus on two and three. The second one about being informed of any violations of Royce's constitutional rights. He had no personal contact with Royce and he relied on his staff to provide care. He never questioned a medical provider's decision to give, send an inmate to an outside provider. I'll try to stick to my time, so let me get to the closing now. Qualified immunity's goal is to avoid a trial for officers who follow the law. So if we go to trial on this, the harm has already been done. It's clear from the evidence that it perpetuates for defendants and Mr. Keech is right. Judge Sharpe said his case is a house of cards and it is. It relies on inference and speculation and that's not enough. Lastly, let me say, Mr. Royce wants to open a Pandora's box to a flood of litigation that we cannot anymore trust medical records of a correctional facility without when we need more evidence than one misdated form about exercise, about exercising in one's cell. Thank you, Your Honors. And let me say in closing, thank you for your permission to file an oversized brief in this case. Thank you. Good afternoon, Your Honors. May it please the Court. George Hoffman representing the appellee in this matter, Nurse Practitioner Amy Gagne. Nurse Practitioner Gagne was not deliberately indifferent to a serious medical need. Basically, as you've heard today, Royce's disagreement with the medical treatment that he received does not rise to the level of a constitutional claim. In fact, Royce is unable to satisfy either prong that's necessary for a deliberate indifference claim. Objectively, he received adequate and reasonable medical care from Nurse Practitioner Gagne. On May 28th, she learned or Royce made his first abdominal complaint in this matter. Now, as you indicated, Judge Livingston, he did indicate nausea previously on May 12th. When he made that complaint, he indicated that he had been prescribed a medication for his headaches, which he believed was causing his nausea. So his first actual abdominal complaint was on the 28th, at which time he indicated that he was constipated, believing it was from an earlier medication that he'd been prescribed. Now, Barksdale's affidavit does testify that he asserts that as a cellmate, he observed that his condition deteriorated significantly in the four to seven days before he went to the hospital. Barksdale witnessed him vomiting loudly at night during three occasions during that period. And I think with respect to the affidavit, you have to go back to as counsel indicated, because you can't look at that alone in a shell. You have to look at it with the rest of the evidence, particularly the St. Mary's Hospital evidence, where Royce indicated specifically in response to, as counsel indicated, when did these symptoms begin? He indicated the prior day to the physicians at St. Mary's Hospital who were treating him with respect to this. But is there an ambiguity as to when what that question really was focusing on, and to the extent we have to look at this in the light most favorable to the plaintiff? I don't believe there's an ambiguity there, Your Honor. When they ask you when did your symptoms begin, and he responds a day before, I don't believe there's any ambiguity there. And, in fact, that's consistent with on May 29th, when officers learn of his vomiting, they actually move him to medical isolation that evening, during the night on May 29th. Nurse practitioner Gagne learns of that that morning, early in the morning, and she learns that his vital signs are normal, his bowel sounds are present in all four quadrants, and he's non-tender. So her response to that is, okay, there are many possibilities for nausea and vomiting. Let's put him on a clear liquid diet, let's give him medication for his nausea, and let's carefully watch him, which they do throughout the day. She receives updates throughout the day as to his symptoms. When she comes to the facility that afternoon and sees that his symptoms are changed, that he does have tenderness, she immediately transfers him to the hospital at that point. That's clearly adequate and reasonable medical care. And, in fact, multiple experts have indicated that her response to the changing conditions was adequate and reasonable. So that brings us to the next prong of the objective portion, where the court's forced to look at the delay. So, if anything, we have a delay from 6 a.m. to 6 p.m., which even Plano's expert said that that's not a delay. She would receive the same treatment whether he went to the hospital at 6 a.m. or whether he went to the hospital at 6 p.m. And that treatment that they provided at the hospital is precisely the same treatment that nurse practitioner Gagne was exercising at the facility, a careful, watchful period, conservatively monitoring his conditions. And, in fact, at the hospital, they did that for four days, which, as counsel indicated, he also has a medical malpractice claim. Well, as part of that, there's a proximate causation argument. The four days of treatment at the hospital would certainly eliminate any proximate causation with respect to the state law medical malpractice claim, setting aside the fact that she didn't deviate from any accepted standard of care. So if Your Honors have no further questions, we would rely on our brief on this matter. Thank you. We talk about this form, and I know Judge Radji asked me some questions about this particular record. And, Your Honor, if I have not answered those questions, it's important to me that I do. But we've had an admission now that she misdated the form, and that can explain why, hey, she put in this about doing the push-ups. That's not her testimony. That's not what's reflected in the form. That form reflects contemporaneous observations of Mr. Royce that morning, and she testified it was contemporaneously created. So if the form is misdated, that's a new fact for me. And if it is misdated, that means that form was created after the fact, which is improper, and can lead to an inference that if you don't have anything to hide, why are you, you know, filing stuff, putting the wrong date on it, after the fact. And, Judge Radji, it is important for me to answer your question. And you said I did not do so. What more can I say about that particular item? Well, I think I understand your point, so thank you. Thank you, Your Honor. Now, we have this issue about the St. Mary's records. The medical records say what they say. Mr. Royce's deposition says otherwise. Mr. Barksdale's affidavit says otherwise. Relative to qualified immunity, that's a factual issue, that generally these days is decided on special interrogatories that are submitted to a jury, and then a judge decides after the fact. There are factual disputes about whether or not there's deliberate indifference to serious medical needs. There can be no qualified immunity because it's well-established and has been well-established since Farmer v. Brennan that you cannot be deliberately indifferent to a detainee's serious medical needs. Now, I guess I'm going to close by saying this. We have this discussion about alone in a shell. You look at this alone in a shell. The defendant's alone in a shell is my, that's conflicting proof that needs to be decided by a jury. There's a discussion about, you know, the house of cards. This is a circumstantial case. I have testimony from some individuals who observed these things. I have, I believe, a credible argument that some of these records may have been created after the fact, and it's a house of cards. I've tried I don't know how many cases in front of the Northern District of New York now, between I think around 15. I've successfully prosecuted many cases that could be described as a house of cards. There are circumstantial cases, and it's the jury that decides whether your case is a house of cards. That can stand, or whether your jury's a house of cards that you can flick one card and the whole thing falls down. Thank you very much. That's the jury's determination. Thank you very much. Thank you for considering my arguments, Your Honors. And we will take the matter under advisement.